UNION, The (DEARBORN v.). See Case No. 3,714.

## Case No. 14,348.

### The UNION v. JANSEN et al.

[2 Paine, 277.] [1]

Circuit Court, S. D. New York. 1837. [2]

SEAMEN—WAGES—ABSENCE WITHOUT LEAVE—DESERTION—STATUTORY PROVISIONS.

1. The 5th section of the act of congress of 1790 [1 Stat. 133]. relative to the absenting of seamen from the vessel in which they shall have shipped, without leave of the officer commanding, is a statutory provision, applying to cases of unlawful absence, or absence without leave,

---

1 [Reported by Elijah Paine, Jr., Esq.]
2 [Reversing Case No. 14,347.]

and is to be distinguished from desertion according to the general principles of the maritime law.

[Cited in The John Martin, Case No. 7,357.]

2. Where, therefore, seamen left their vessel with the intention to return, but without the permission of the officer on board who was authorized to give such permission, and remained away more than forty-eight hours, it was *held*, that though their misconduct did not amount to desertion, it was an unlawful absence within the foregoing act, and that they had forfeited their wages.

3. In such case, the seamen, by leaving without permission, took upon themselves the hazard of getting back, and it was no part of the captain's duty to see to getting them on board.

[Appeal from the district court of the United States for the Southern district of New York.]

The libel was for wages, on a voyage from New York to Liverpool and back; and the question will be, whether there was a forfeiture of wages by desertion, or the libellants leaving the ship at Liverpool. The libel alleges, that on the 11th of August, the libellants, by the permission of the first officer—the captain being on shore—went on shore for the purpose of getting their dinner; that they had not been on shore more than twenty minutes or half an hour, before they returned and found the ship had left the pier and was lying off and on in the stream; that they made signals and endeavored to get on board; but that they were refused by the ship's boat, saying they had orders from the captain not to take them. The answer admits the shipping of the men, and their proceeding on the voyage, doing their duty at all times until the 11th of August; and alleges, that libellants on that day went on shore and left the vessel, but denies that they did this by the permission or consent of the first officer, but were forbidden to go on shore, and went in disobedience of his orders; believes they went with intention not to return, as the cook and steward had done that morning; no dinner prepared on board until two o'clock; the ship all ready for sea—only waiting for the captain to come on board; the difficulty of getting out of port; ship obliged to leave the pier-head, and fall out into the stream, the dock-master requiring it to be done; that master, on coming on board, found the men absent, and ship lay out in stream for them at distance of from a quarter to half a mile until nearly three o'clock; denies that the men returned to pier-head whilst the ship lay off and on in the stream; denies, or believes no signals were made; no signals seen, or hailing heard; a glass used to see whether men were in sight; denies that they endeavored to get a boat, or prevail on any one to take them on board, or that orders were given by the captain not to take them on board; but alleges, that the captain gave orders to the shipping-master, who went on shore in the boat that carried the captain on board, to bring the men on board if he could find them, and if not, to get other men; denies there was any boat that tended the ship—no necessity for one; vessel lay by the dock, and employed a boat but once to take captain on board. Entry made in log-book A. The answer alleges, that Jansen's clothes were put in charge of second mate, to deliver to him, and that they were delivered to some person in New York, who brought an order for them. Brown's clothes were of little value, and were given by second mate to their boys. Answer denies any wages due, but have been forfeited by the desertion of the vessel; alleges that Jansen is a foreigner and not a citizen; that he shipped fraudulently.

Decree of the district court: That libellants recover their wages and the value of their clothes, and case referred to the clerk to ascertain the amount; and on coming in of the report, which was confirmed, final decree entered. [Case No. 14,347.]

| | | | |
|---|---|---|---|
| Jansen for wages.............. | $49 50 | | |
| " clothes............ | 26 00— | $75 50 | |
| Ritan, for wages............. | 49 50 | | |
| " clothes ............ | 40 50— | 90 00 | |
| Brown, for wages............. | 54 50 | | |
| " clothes ............ | 36 75— | 91 25 | |

Decree ...................... $256 75

Together with costs to be taxed.

THOMPSON, Circuit Justice, in reversing the foregoing decree, said: There is certainly, in this case, much conflicting and contradictory evidence upon many of the allegations brought under consideration by the libel and answer; and if it was material to the decision of the cause to decide upon all these matters of fact, I should be much in doubt as to the conclusion which ought to be drawn upon many of them. But I think the decision of the case does not require a minute examination of all these questions, or a conclusion as to the truth of all the matters brought in contestation. The result, in my judgment, must turn upon the question whether the libellants left the ship by permission, express or implied, from the officer on board who was authorized to give such permission, and the inquiry is reduced down to a strict question of right and duty.[3] There is no question, from the whole of the evidence on both sides, that although the ship was hauled off into the stream, she lay there between two and three hours, at a distance not exceeding half a mile; and that there was ample time for the libellants to have got on board and boats plenty at the dock to have taken them on board. If they left the vessel by permission of the proper officer, there was no violation of duty on their part if they did not wait an unreasonable time, and the captain ought to have seen to getting them on board. But if they absented themselves without permission, it was a violation of duty on their part, and they assumed upon themselves the hazard of getting on board.

I do not think that the libellants are to be considered as deserters, according to the general principles of the maritime law. The evi-

---

[3] See note at end of case.

dence does not warrant the conclusion that they left the ship with the intention of abandoning her; they most likely intended to return. There was plausible ground for their barely going on shore to get their dinners, ·as the cook and steward had deserted and no dinner prepared for them at the usual time on board; but they knew the ship was ready and on the eve of sailing, and the evidence is uncontradicted that she was obliged· to leave the dock. She was ordered off by the dock master, and there can be no pretence that she hauled off with any view to prevent or embarrass the libellants in getting on board. Nor is there any reason to conclude that the captain wished to leave them. Their services were wanted on board, and no complaint whatever was made against them. They allege, in their libel, that they had faithfully discharged their duty on the outward voyage, and up to the very day the vessel sailed; and this is fully admitted in the answer; and the trifling disparity between their wages, fifteen dollars a month, and that given to other seamen, twelve dollars and fifty cents, could not have furnished any inducement to the captain to leave tried men, who had proved good and faithful, for the hazard of untried men.

But although there was not a desertion within the general principles of the maritime law, there may be a forfeiture of wages created by statute. The 5th section of the act regulating seamen in the merchant service (Act 1790, c. 29, § 5) provides that, if any seaman, &c., shall absent himself from the ship or vessel in which he shall have shipped without leave of the master or officer commanding on board, and the mate or other officer having charge of the log-book shall make an entry therein of the name of such seaman, &c., on the day he shall so absent himself, and if such seaman, &c., shall return to his duty within forty-eight hours, such seaman, &c., shall forfeit three days' pay for every day for which he shall so absent himself, to be deducted out of his wages. But if any seaman, &c., shall absent himself for more than forty-eight hours at any one time, he shall forfeit all the wages due to him and all his goods and chattels on board, at the time of his desertion, &c. This section of the act applies to cases of unlawful absence, or absence without leave, and is to be distinguished from desertion according to the general principles of the maritime law, and is to be considered a statutory provision for a particular case. The entry of the absence without leave was duly made in the log-book, according to the requisitions of the act. This is the view of this statute, and the distinction between a desertion according to the general principles of the maritime law, and a statutory forfeiture of wages for absence without leave, taken by Mr. Justice Story in the case of Cloutman v. Tunison [Case No. 2,907], and which I consider the correct view. And this brings me to what I consider the

turning point in the cause. Did the libellants absent themselves from the vessel without leave? If they did, it was a violation of their duty, and the failure to return on board within forty-eight hours worked a forfeiture of their wages. ·It is not a reasonable inference to be drawn from the evidence, that it was not in their power to get on board of the ship. They allege, in their libel, that the ship had left the pier when they returned, and was lying off and on some distance from the shore, but not so far distant but that they could, from the end of the pier, distinguish the persons on board, and made signals that they wished to get on board the ship; and, from the answer and proofs, it is clear that the ship was not to exceed half a mile from the pier, and lay there between two and three hours, and a great number of small boats lying at the pier, and that they could have been put on board for about a shilling apiece. The allegation in the libel is, that they went on shore to get their dinner, with the permission of the first officer, the captain being on shore. Any permission given by Smith, the second mate, must be laid out of view, because, in the first place, he had no authority to give any such permission whilst the first mate was on board, and, secondly, proof of absence by permission of the second mate is not according to the allegation in the libel. Coffin was the first mate, and he swears that the libellants did not ask of him permission to go on shore, and that he did not give them any such permission, but, on the contrary, forbid them to go; that they were about twenty feet distant from him and heard him forbid them. Smith, the second mate, says that Jansen asked permission of him to go on shore, which he gave, instructing him to return as soon as possible; and that the two other men accompanied Jansen; and that he heard the chief mate give Jansen permission, and did not hear the pilot say anything on the subject. Here the first and second mate stand directly opposed to each other. The former swears that he gave no permission, and the latter swears that he heard him give permission; but, even according to Smith's evidence, permission was only given to Jansen. The evidence upon this point is somewhat contradictory, but the weight of evidence is clearly that the libellants left the ship without permission of the first mate, he being the officer in command at the time, the captain not being on board. A brief reference to what the witnesses have said on this point will be sufficient to show where the weight of evidence lies; and, in the first place, what is the evidence that any permission was given by the first mate. Ritan, one of the libellants, says that Jansen asked permission of the first and second mates, and that all three went publicly, so as to be seen by the mates, pilot and all others about there. In his examination before the commissioners the question is put to him: "Did you go on shore with the permission of

the mate?" To which he answers: "The mate stood close by us when we went on shore from the bows; did not say a word one way or the other; he might have spoken to Brown or Jansen." And Jansen, in his examination in the civil suit, says he went ashore to get his dinner: asked leave and was told by the second mate if he was back in an hour and a half it would be in time. In his examination before the commissioner he says, he asked the mate and pilot if he might go on shore to get his dinner. The mate said he might go, but must not stay long. It is not easy to reconcile this witness with himself, and it is almost incredible that he could have been told that if he was back in an hour and a half it would be in time. At all events, this permission was given by the second mate, who had no authority to give it. Brown, the other libellant, says that he, with Jansen and Ritan, went on shore to get their dinner, but says nothing about having permission for that purpose. Kreigsman, a seaman on board, says he had permission from Coffin, the mate, to go on shore and get some grog. He saw Jansen speaking to the mate just before he and Ritan and Brown went on shore, but he does not state what was said. Holmes, a boy about seventeen years of age, says he heard Jansen ask permission of the mate to go on shore and get dinner: the three men were together; the mate said they might go; they said they would not be away over twenty minutes. He does not say which mate it was who gave this permission.

This is all the evidence on the part of the respondents, to show that any permission was given them to leave the vessel: and it is extremely doubtful, whether even from this any permission was given, except by the second mate. But admitting that it affords a reasonable presumption that lawful permission was given, this is fully met and overbalanced by the evidence on the part of the appellants. Coffin, the first mate, not only denies giving any permission, but says he expressly forbid them to go on shore. Corwin, the pilot, says the three libellants were in a state of intoxication; he saw them leave the ship at about a quarter or half-past twelve o'clock, but did not hear permission given for them to go on shore; that he did himself order them to stay on board, and to go below and go to bed, but did not hear either of the mates give them any orders. Although the pilot might not have had authority to forbid their going on shore, yet this evidence is in conflict with that of Jansen, who says he asked the mate and pilot if he might go on shore to get his dinner. Edmonson, the tailor, a witness on the part of the libellants, says he heard both the mate and pilot request them to remain on board. Although this was not in terms a positive order not to go on shore, it is a direct denial of any permission having been given by the mate. William Jones, the rigger, says he

saw them leave the ship while she lay at the pier-head; did not hear permission given them to leave the ship, but heard one of the mates, does not recollect which, call out to them, and ask where they were going: their reply was they would not be gone more than twenty minutes, and they ran off. This must have been the first mate, for the second mate swears that he gave them permission to go, and it is noways likely that he would after that have called out in the manner represented by the witness; and it is negativing any permission given by the first mate. Libby, the boarding-house keeper, was going down with the captain, when he was going on board of the ship, and they met the three men, and Captain Mahan asked them where they were going: their reply was, only to get a glass of grog; when he said they must come back immediately, as he was going directly to sea. This reply of the captain may, perhaps, be considered somewhat equivocal. From the terms used, however, the order was positive to return immediately. And no explanation appears to have been asked the witness, in what sense he understood it. And it is to be observed, that they told it a falsehood by saying they were only going to get a glass of grog, whereas, from all the evidence, it appears that they were going to get their dinner.

From this comparison of the evidence, I cannot resist the conclusion, that these men left the ship, at all events, without permission of the proper officer, and I think the better conclusion is, that they went in violation of the orders of the first mate. And if so, it was clearly an absence without leave of the master or officer commanding the ship, within the sense and meaning of the act of congress. I do not think the evidence warrants the conclusion, that they left the ship with intention to desert, and not return; they left their clothes on board, and the evidence is very satisfactory that they did return to the pier, after the ship left it. But they were evidently not very anxious to get on board, for the ship was within less than half a mile from the pier, and lay there between two and three hours, and some twenty or thirty boats laying there, which might have put them on board at the expense of about one shilling each; and it is hardly conceivable that they could have been so destitute of money and credit as to be obliged to abandon the ship on this account, if they had been very desirous to get on board; the boatman would most likely have trusted to the captain's advancing this trifling sum for them when they got on board. And, besides this, two witnesses, Libby and Kelly, swear that they each offered to procure them a boat to put them on board the ship. They seem, however, to have acted on the assumption that it was the duty of the master to send a boat for them; and that they meant to put themselves upon what they considered their strict legal right; and if they had left

the ship with the permission of the proper officer, they would have been right, and the captain ought to have sent for them. But if, as I think, the evidence shows they left the ship without leave of the master or officer commanding the ship, they assumed upon themselves the risk of not being able to return on board within the time limited by the act of congress. They left the ship upon the very eve of her leaving the pier, and with full knowledge that she was ready for sea; and concluding, probably, that if left in a port like Liverpool, there would be no great difficulty in shipping on board some other vessel. There is no reason to suppose that the ship put off with any design of leaving these men; she was ordered off by the dock-master. But the captain probably thinking that the men had done wrong in leaving the ship in the manner they had done, and particularly as he had ordered them to come back immediately, considered himself justifiable in leaving them to get on board as well as they could; putting himself upon what he thought his strict right, and their duty. And his rights, in this respect, would not be changed, admitting it to be true that he told the boatman who put him on board not to bring off the men. This was not the ship's boat, but a shore boat, in no manner under the authority and command of the captain, nor had it been in the employ of the ship, except to put the captain on board at that time. Had it been in a port where no other boat could have been procured, it might have been considered harsh and severe in the captain, if no more; but there were a great many other boats they might have obtained at the trifling expense of about one shilling each. Under these circumstances, I think it is a case turning upon the strict legal rights of the parties; and as the evidence, in my opinion, proves that the libellants left the ship without leave, they were bound to return within forty-eight hours, in order to save a forfeiture of their wages. I am, accordingly, of opinion that the decree of the district court be reversed, and a decree entered for a forfeiture of the wages; each party paying his own costs.

NOTE. Ward v. Ames, 9 Johns. 138. Ames brought an action of assumpsit in the court below, against Ward, as master of the ship Margaret, to recover his wages as a seaman on board of the said ship, on a voyage from New York to Cadiz, and back to New York. The defendant pleaded non assumpsit, and that the plaintiff had forfeited his wages by desertion. The plaintiff had signed the articles, in the usual form, for the voyage, and performed his duty as a seaman on board the ship until the 22d February, 1810, when the ship was lying in the harbor of Cadiz. The plaintiff was ordered by the mate to strap a block, and while doing it, was asked by the mate why he did not tar the rope, and was answered that he had done so; the mate then struck the plaintiff violently and repeatedly. He knocked him down several times, and beat him in a cruel and unjustifiable manner. The plaintiff, after he had been so treated, struck the mate with a marling spike, and cut his head. The defendant was on the quarter-deck during the

time, but did not interfere until after the plaintiff struck the mate, when he came up and struck the plaintiff. The mate went on board a British ship of war lying in the harbor, and had the wound in his head dressed, and shortly after, a midshipman with a boat's crew came from the British ship on board the Margaret, and demanded the plaintiff. The midshipman was invited into the cabin by the defendant, who permitted the British seamen to search for the plaintiff, who kept concealed and was not found. The visit and search for the plaintiff, by the British officer and men, was twice repeated, without any opposition on the part of the defendant; and plaintiff concealed himself each time, so as to avoid discovery. On the night of the 22d February, the plaintiff left the Margaret, and got on board of another American vessel, and worked his passage home, without wages, and arrived in New York the May following. The court below gave judgment for the plaintiff for the whole amount of his wages, being eighty dollars.

Per Curiam: The question arising on this case is, whether the plaintiff below was not compelled to leave the ship, and actually forced out of the service by cruel treatment, and the danger of impressment, through the agency of the master. The court below must have drawn that conclusion. The seaman was, in the first place, and without any justifiable cause, cruelly beaten and abused by the mate, in the presence, and by the tacit consent of the master. He was provoked to strike in his defence, and the mate was wounded in the head. With the knowledge, and, it is to be presumed, by arrangement with the captain, the mate went on board of a British man-of-war, lying in the harbor of Cadiz; a boat belonging to that ship, with a midshipman and crew, soon after came on board the Margaret, and demanded the plaintiff, Ames. They made repeated searches for him, and with the apparent approbation of the captain; and on the same night the plaintiff left the ship. This is a strong case of an escape coerced by ill usage and danger of personal safety. No explanation of the transaction was given by the master upon the trial of the cause, and the court below were warranted in their deduction, that this conduct was equivalent to an unjust and forcible removal of the seaman from the ship, and that he did not, therefore, forfeit his wages. It is an acknowledged principle in the marine law, that if the master unjustly dismiss a seaman during a voyage, he is entitled to his full wages for the voyage. Abb. Shipp. p. 4, c. 2. § 1; Poth. Louage des Matelots. n. 206; Laws of the Hanse Towns, art. 42. And it has been considered and held, that if a seaman is obliged to fly from a service, by extreme ill usage and danger of his personal safety, arising from the master, who is bound to protect him, it is not the case of a voluntary desertion, but comes within the reach of the above principle. Rice v. The Polly & Kitty [Case No. 11,754]; Thorne v. White [Id. 13,989, note]. If the facts did not absolutely require, they were at least sufficient to uphold, this deduction, and the competent tribunal having drawn it, there is no just ground for our interference. The judgment below must be affirmed.

Webb v. Duckingfield, 13 Johns. 390. Duckingfield brought an action in the court below against Webb, to recover his wages as a seaman on board of the ketch Maria, of which Webb was master, on a voyage "from Savannah to Rotterdam, or one more port in Europe, and from thence to her port of discharge in the United States." The plaintiff below performed his duty on board the vessel during the voyage, and until she arrived in New York, her last port of discharge, and was safely moored in port, when he left her, refusing to remain on board, or to assist in discharging the cargo, though he and the rest of the crew were requested to remain. The plaintiff below never returned to the vessel, and the master was obliged to hire persons to discharge the cargo. The mate, on the day the

plaintiff below left the vessel, and on each day until the cargo was discharged, made the following entry in the log-book: "All the crew absent without liberty." The court below being of opinion, that, as the voyage was ended by the arrival and safe mooring of the vessel in her port of discharge, the plaintiff below could not be deemed a deserter, so as to incur a forfeiture of his wages; and further, that, to create a forfeiture, the name of the particular seaman who was absent without leave must be entered in the log-book; and they therefore, gave judgment for the plaintiff below, for 180 dollars, being the amount of wages due to him on the day he left the vessel. The articles signed by the; parties contained the following clause: "The said seamen severally promise, &c., not to neglect or refuse doing duty by day or night, nor shall go out of the said vessel &c., until the said voyage be ended, and the vessel be discharged of her loading, without leave first obtained of the captain or commanding officer on board." "That no officer or seaman, belonging to the said vessel, shall demand, or be entitled to, his wages, or any part thereof, until the arrival of the said vessel at her above-mentioned port of discharge, and her cargo delivered." "Provided, nevertheless, that if any of the said crew disobey the orders of the said master, or other officer of the said vessel, or absent himself, at any time, without liberty, his wages, due at the time of such disobedience or absence, shall be forfeited, and in case such person or persons, so forfeiting wages, shall be reinstated, or permitted to do further duty, it shall not do away such forfeiture."

Van Ness, J., delivered the opinion of the court: All the seamen belonging to the ship, whose last port of delivery was New York, deserted her at that place as soon as she was moored, and refused to assist in unloading the cargo: and the question is, can they recover their wages up to the time of the desertion, or not? The determination of this question has nothing to do with the mate's making an entry in the log-book of the desertion. Such entry, if it had been made, would have been prima facie evidence of that fact; but, as it is fully proved by the other testimony, that is sufficient, without the log-book. The reasons for making these entries in the log-book are accurately stated by Judge Peters,—Malone v. Bell [Case No. 8,994].—and have no application to this cause. By the 6th section of the act of congress for the government and regulation of seamen in the merchants' service (1 L. U. S. 140 [1 Stat. 133]), it is enacted. "that, as soon as the voyage is ended, and the cargo, or ballast, be fully discharged at the last port of delivery, every seaman, or mariner, shall be entitled to the wages which shall be then due, according to his contract," &c. From this, as well as the reason and propriety of the thing, the contract with a seaman continues in force until the cargo is finally discharged, and, if he leaves the ship without justifiable cause, before that is accomplished, he has no right to recover any part of his wages. The shipping articles contain an express stipulation by which the wages are forfeited, in this case, in the very event which has happened: but the counsel for the seaman supposes this stipulation to be illegal, because it forms no part of what is provided shall be contained in the contract between the master and crew, by the 1st and 2d sections of the act before referred to. The master has no right to insert any stipulation, or agreement, repugnant to, or inconsistent with, the statute; but there can be no objection to superadding any provisions harmonizing with it. Such is the provision in question, which only follows the 6th section of the act, which may be considered as a legislative definition of what shall be deemed to be the termination of a voyage, so as to entitle the seamen to their wages. The principle upon which the two cases of McMillan v. Vanderlip, 12 Johns. 166, and Jennings v. Camp, 13 Johns. 94, were decided, is strictly applicable to this case. The judgment below must be reversed.